

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| TOMMY STEPHENS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 6:05-CV-468 |
| | § | |
| WESTERN PULP PRODUCTS | § | |
| COMPANY | § | |

## ORDER

Before the Court is Defendant Western Pulp Product Company's Motion for Summary Judgment (Doc. No. 23), Plaintiff's Response, and Defendant's Reply. Having carefully considered the motion, the competent summary judgment evidence and the applicable law, the Court hereby GRANTS Defendant's motion in all things.

I.      Background

This case arises out of a personal dispute between two employees of Defendant Western Pulp Products Company ("Western Pulp").  As Western Pulp characterizes it, this is a situation "where a plaintiff is suing his former employer for failing to prevent him from beating a fellow co-worker" because of personal animosities between the two.

Western Pulp manufactures paper pulp products for commercial use.  In

1

order to create the pulp, raw materials are placed into a hydropulper machine

called a "beater."  Western Pulp employed Plaintiff Tommy Stephens ("Stephens")

to work as a "beater operator."  As the beater operator, Stephens' job consisted of

picking up a bale of raw material with a forklift, placing it into the beater, and then

adding the necessary water and chemicals to turn the raw material into pulp slurry.

From there, the pulp slurry goes to a "machine operator," who is responsible for

molding the pulp slurry into a marketable product such as edge guards and corner

guards for furniture.

        The beater operator and machine operator work closely together to maintain

the chemical composition and consistency of the pulp slurry.  If the machine

operator left his station to go on break, the beater operator was responsible to

monitor the status of the molding machines.  Similarly, if the beater operator left

to take a break, the machine operator would watch over the beaters.  The machine

operator and beater operator are peer positions, and neither position has any

supervisory authority over the other.

        Western Pulp hired Thomas Green ("Green") as a machine operator.   Soon

thereafter, Stephens reported  to Central Division Manager, Kyle Kirk ("Kirk"),

that he was having a personality conflict with Green.  According to Stephens, he

had accidently let the beaters overfill.  Green turned off the water to the beater but

allegedly called Plaintiff a "stupid bastard."

A day or two later, Green used a pressure washer to clean the floor by his area and allegedly sprayed water by the beaters.  Stephens believed Green sprayed the water there deliberately.  Stephens saw the water on the floor, but still attempted to drive his forklift through the area.  The forklift lost traction, and Stephens dropped a load of material on the floor.  Several days afterwards, Green complained that Stephens was not taking over for him while he went on breaks. Green allegedly told Stephens, "You aren't anything but pure shit."

Stephens told Kirk that because he had a "short temper," he "did not want to have a situation where [he] and Green ended up taking swings at each other." Kirk informed Stephens that he would investigate his complaints.

Immediately after meeting with Stephens, Kirk spoke with Roy Daniels ("Daniels"), the supervisor of both Stephens and Green, about Stephen's complaints.  Daniels stated that he was aware that Green had turned of the water to the beaters, and that Daniels had told Green that was the right thing to do.  Green informed Daniels that he had told Stephens that leaving the water running was "a stupid thing to do," but Green denied calling Stephens a "stupid bastard."

Daniels also was aware of the water on the floor, but he had not seen or heard anything that led him to believe that Green left it there intentionally.

3

Nevertheless, he instructed Green to help clean up both the bale of material that Stephens had dropped, and the water on the floor.  Green did both.

That same day, Kirk and Daniels both met with Green to discuss Stephens' complaints.  Green explained that he had turned off the water to the beaters because if he had not, it would have negatively affected his ability to do his job. He reiterated that he may have said that what Stephens did was stupid, and may have even called him a slacker, but he denied calling Stephens a "stupid bastard." Green also denied spraying water deliberately into Stephen's area, and confirmed that he had helped clean up the water and the broken bale.

Last, Kirk asked Green whether he and Stephens were telling each other when they were taking breaks.  Kirk emphasized that Western Pulp expected the machine operator to take over for the beater operator (and vice versa), and Green needed to communicate with Stephens about breaks.  Green agreed to do so.

Within an hour of meeting with Green, Kirk and Daniels held a final meeting with both Stephens and Green.  Kirk stressed that neither employee should engage in name-calling or profanity, and that each of them had to inform the other when they were going to take breaks.  Kirk emphasized that it was very important that they respect each other and work together cooperatively.  Both Stephens and Green indicated that they understood.  Stephens and Green shook

4

hands and went back to work.

However, within a few weeks, Stephens complained again to Daniels that Green had turned off Stephens' forklift on at least four or five occasions.  When confronted, Green had told Stephens that the running forklift was wasting gas, and that Western Pulp policy required the operator to turn off his forklift if he was more than 15 feet away from the vehicle.  However, Stephens complained to Daniels that Green turned off his forklift solely to "harass" and "annoy" him.

Daniels investigated the matter and spoke to Green about it.  Green stated that Stephens constantly left the forklift running, and the fumes gave him a headache.  Daniels had previously received complaints from the maintenance department about Stephens' habit of constantly running his forklift.  Moreover, it was Western Pulp's policy, practice, and procedure for all forklift operators to turn off their forklifts if they were more than 15 feet away or if they were out of sight of the forklift.  Daniels concluded that Green had done nothing wrong in turning off Stephens' forklift, and decided no further action was warranted.

A few weeks later, Stephens again spoke to management about Green's "harassment."  This time, Stephens complained that Green was checking the pH levels of his beater.  He complained that, though there was nothing improper, per se, about Green's checking the levels, Green would make a "funny walk" solely to

annoy Stephens.

On April 6, 2005, Stephens complained again to Kirk about Green. Stephens stated that he had left his forklift unattended while he went somewhere else, and when he came back, he found that Green had turned off the forklift. According to Stephens, Green gave him a "look" after turning off Stephen's forklift.  Stephens testified that Green "would look over his shoulder after he turned [the forklift] off and start grinning at you, like he was annoying you."

Kirk told Stephens to discuss the matter with Daniels, his supervisor.  Kirk immediately paged Daniels and instructed Daniels to meet with Stephens to discuss the situation.  Instead of meeting with Daniels, Stephens walked off the job in the middle of his shift.

Kirk called Stephens the next day to inform him that because he had walked out of the plant without permission, he would be suspended for two days. Stephens responded that he had informed management about Green's conduct several times and that Western Pulp had failed to take any action.  Stephens said that he had contacted the Labor Board and planned to talk to a lawyer.  Stephens also placed a call to the CEO and owner of Western Pulp, Rich Hurley.  Hurley encouraged Stephens to return to work and allow the company to look into the situation.

Upon returning to work following his suspension, Stephens once again complained to Daniels that Green harassed and annoyed him about his suspension. According to Stephens, Green was "jumping up and down like a kid and hollering, "Yeah, yeah," something to that effect, "You got suspended, didn't you?  Are you going to do it again tonight?"  He reported this incident to Daniels and said this greatly annoyed him, and he took it as a sign of personal animosity.

Daniels called Kirk to report the continuing tension between Stephens and Green.  Daniels and Kirk agreed that they needed to meet with Stephen and Green "to let them know that Western [Pulp] has spent enough of its managements' time refereeing their personal bickering."

Before that meeting was scheduled, and just two hours of Daniels' report to Kirk, the two employees engaged in a verbal shouting match.  According to Stephens, he had clocked out and was on his way out of the plant with another employee when he saw Green.  Stephens testified that Green "walked straight up in my face and he hollered, 'What are you looking at.'" Stephens stated that he came back with the same thing when he saw Green's right arm "come up."

Stephens then began repeatedly striking Green before he was pulled off him by another employee.  Stephens does not dispute that he struck Green multiple times.   Western Pulp has a zero tolerance policy for the use of force by one of its

employees, and striking another employee is a terminable offense.  After

conducting an investigation into the altercation, Western Pulp terminated

Stephens.

It is undisputed that Green never struck Stephens.  However, because the

investigation showed that Green's comments and actions that day may have helped

lead to the altercation, Green was suspended for two days.

Following his termination, Stephens brought suit against Western Pulp.

Stephens seeks damages from Western Pulp for co-worker Green's alleged assault,

i.e., the raising of his arm before Stephens struck him.  Western Pulp filed the

instant motion for summary judgment, claiming that because the alleged assault

was not authorized by the company or was not in furtherance of any aspect of

Green's job, Western Pulp is not liable to Stephens.  That issue is now properly

before the Court.

II.    Summary Judgment Standard

A motion for summary judgment should be granted if the record, taken as a

whole, "together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of

law."  FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986);

*Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  The

Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment, the movant, "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (an banc) (quoting *Celotex*, 477 U.S. at 323-25).  A fact is material if it might affect the outcome of the suit under the governing law.  *Merritt-Campbell, Inc. v. RxP Products, Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961.  If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to

interrogatories, admissions on file, or other admissible evidence that specific facts

exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments,*

*Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d

1042, 1046-47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by

argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt

as to the facts, or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio*, 475 U.S. 574, 585 (1986); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d

at 1075.

When ruling on a motion for summary judgment, the Court is required to

view all justifiable inferences drawn from the factual record in the light most

favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at

961. However, the Court will not, "in the absence of any proof, assume that the

nonmoving party could or would prove the necessary facts." *McCallum*

*Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *as*

*modified*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a

reasonable jury to return a verdict in the opposing party's favor, there is no

genuine issue for trial, and summary judgment must be granted. *Celotex*, 477 U.S.

at 322-23; *Anderson*, 477 U.S. at 249-51; *Texas Instruments*, 100 F.3d at 1179.

10

III.    Discussion

The established general rule in Texas is that it is not ordinarily within the scope of a servant's authority to commit an assault on a third person. *See Green v. Jackson,* 674 S.W.2d 395, 398 (Tex. App.–Amarillo 1984, writ ref'd n.r.e.).  The courts reviewing such assaults find them to be usually expressions of personal animosity and not for the purpose of carrying out the master's business. *Id.*  Thus, the case in which liability has been imposed upon an employer for his employee's assault are relatively few. *Id. (citing Texas & Pac. Ry. Co. v. Hagenloah*, 247 S.W.2d 236, 239 (1952)).

In order to impose vicarious liability against an employer for an employee's assault, a plaintiff must prove that the employee's acts: (1) fall within the scope of his or her general authority; (2) are in furtherance of the employer's business; and (3) are for the accomplishment of the object for which the employee was hired. *See, e.g., McCray v. DPC Indus., Inc.*, 875 F. Supp. 384, 391 (E.D. Tex. 1995); *see also Durand v. Moore*, 879 S.W.2d 196, 199 (Tex. App.–Houston [14th Dis.] 1994, no writ); *Kendall v. Whataburger, Inc.*, 759 S.W.2d 751, 754-55 (Tex. App.–Houston [1st Dis.] 1988, no writ).

It is not enough that a plaintiff proves a history of personal animosity that ultimately resulted in a tortious act. *Humber v. Adams*, 390 S.W.2d 857 (Tex.

App.–Dallas 1965, writ ref'd n.r.e.) (upholding summary judgment in favor of

defendant because fight between co-workers on the job site arose out of personal

disputes).

Moreover, summary judgment is mandated if the alleged tortious act was

not authorized in some manner by the employer.  *See, e.g., Garrett v. Great W.*

*Distrib. Co. of Amarillo*, 129 S.W.3d 797 (Tex. App.–Amarillo 2004, pet. denied)

(upholding summary judgment for defendant because there was no evidence that

alleged assault between co-workers was authorized by employer).

In order to establish vicarious liability against an employer for an

employee's assault, there must typically be something in the nature of the

employee's job that would routinely call for the use of force.  As has been stated in

this district:

> The prime example where liability may extend to the employer is
> where the employer's duty is to guard the employer's property and to
> protect it from trespassers; there the nature of employment necessarily
> involves the use of force in furtherance of the employer's business
> and using greater force than necessary may make the employer liable.

*See McCray*, 875 F. Supp. at 391.

In a very recent case, a Texas appellate court made it very clear that

"summary judgment is appropriate either when the movant conclusively proves

that the employee was not authorized by his employer to utilize physical force in

12

furtherance of his job duties, or when the assault arises from personal animosity between the employee and the plaintiff." *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 495 (Tex. App.–Fort Worth 2002, no pet.) (upholding summary judgment for employer GATX because supervisor's assault of employee while disciplining him was not authorized by company).

Here, the summary judgment evidence, viewed in the light most favorable to Stephens, establishes that Stephens saw Green's "right arm come up" and Green showed a fist.  Western Pulp denies that Green's gesture constituted a legally actionable assault.  However, even accepting *arguendo* that Green committed an assault against Stephens, Western Pulp argues that Stephens still may not recover against <u>Western Pulp</u> as a matter of law.  The Court agrees.

The summary judgment evidence demonstrates that, as in *Humber* and *Wrenn*, the altercation between Stephens and Green arose out of personal disputes and animosities.  In recounting the acts that transpired between Stephens and Green, Stephens repeatedly testified in his deposition that he believed that actions taken by Green were done with the express purpose of "annoying" and "harassing" him.  Stephens further testified in his deposition that he took the instances of "harassment" by Green as an indication of Green's personal animosity towards him.

However, Stephens does not, and cannot allege, that any of these acts were made within the scope of Green's employment or were in furtherance of Western Pulp's business.  There is no evidence supporting that Western Pulp authorized Green to use physical force in performing his job functions as a machine operator and, in fact, Western Pulp prohibited such conduct by its zero tolerance policy.[1]

Admitting that Western Pulp does not tolerate such force, Stephens then responds that he alleges a cause of action for negligent supervision and retention as well as assault, so that summary judgment should not be granted.  However, in his complaint against Western Pulp, Stephens alleged only one cause of action; namely, assault based on a theory of vicarious liability.  His complaint does not mention the word "negligence."

Further, Western Pulp submits summary judgment evidence in the form of interrogatories completed by Stephens that inquire as to all of plaintiff's causes of action against Western Pulp.  Stephens answered the interrogatory with one cause of action–assault.

The deadline for Stephens to amend his pleadings occurred on May 8, 2006,

---

[1]Even if Stephens had put forward sufficient evidence showing that Green's assault was in the scope and in furtherance of his job, his claim would still be barred by statute. In that case, Stephens' assault claim would fail because he would have proven the assault to be a work-related action subject to the exclusive remedy provision of the Texas Workers' Compensation Act. *See Mackey v. U.P. Enter., Inc.*, 935 S.W.2d 446, 459 (Tex. App.–Tyler 1996, no writ).

and discovery closed on June 15, 2006.  Stephens has never amended his

complaint to add another cause of action. He cannot, through his response, now

add another cause of action for negligent supervision and retention to survive

summary judgment.  *Broussard v. Oryx Energy Co.*, 110 F. Supp. 2d 532 (E.D.

Tex. 2000).

Moreover, even if Stephens had properly stated a cause of action for

negligent supervision and retention, his claims would be foreclosed by the Texas

Workers' Compensation Act.  *See* TEX. LAB. CODE ANN. § 408.001(a); *Ward v.*

*Bechtel Corp.*, 102 F.3d 199, 203-04 (5th Cir. 1997).  Western Pulp submits

summary judgment evidence that it has, at all times relevant to allegations in this

lawsuit, had workers' compensation coverage for all its employees, including

Stephens.  Because Western Pulp subscribes to Workers' Compensation, Western

Pulp is entitled to summary judgment on any negligent hiring, supervision, or

retention claims against it because of the exclusive remedy provision of the

Workers' Compensation Act.

Finally, even if Stephens had properly asserted a claim of negligent

supervision or retention, and Western Pulp was not a subscriber to Workers'

Compensation, Western Pulp would still be entitled to summary judgment on this

claim.

In order to establish a claim for negligent supervision or retention against an employer that does not subscribe to Workers' Compensation, an employee must prove that: (1) the employer owed the plaintiff a legal duty to supervise its employees; (2) the employer breached that duty; and (3) that breach proximately caused the plaintiff's injuries. *See Knight v. City Streets, L.L.C.*, 167 S.W.3d 580, 584 (Tex. App.–Houston [14th Dist.] 2005, no pet.).  To establish that Western Pulp's actions were the proximate cause of his injuries, Stephens must prove that Western Pulp's actions in supervising Green were: (1) the cause-in-fact of plaintiff's injuries; and (b) that Green's assault and Stephens' resulting injuries were a foreseeable consequence of Western Pulp's supervision of Green.  *Id.* at 584; *Wrenn*, 73 S.W.3d at 496.

According to Stephens' testimony, the first instance of "harassment" occurred when Green turned off the water to the beater and allegedly called Stephens a "stupid bastard" for letting the beater overfill.  The next incident of "harassment" continued a day or two later when Green sprayed water by the beaters, and Stephens believed the act to have been done deliberately.  He also complained that when he dropped a load of material on the floor, Green allegedly told him, "You aren't anything but pure shit."

Stephens testified that after Defendant's management met with both

16

Stephens and Green, they shook hands and were able to work together again.  In his deposition testimony, Stephens testified that, in his mind, Defendant's management had satisfactorily resolved the issue at that time.

It is undisputed that the problems between the two employees continued: Western Pulp investigated complaints by Stephens regarding Green turning off Stephens' forklift on several occasions, complaints by Stephens regarding Green taking his breaks at his workstation, complaints by Stephens that Green was taking pH readings too early, and complaints by Stephens that Green would use a "funny walk" or "look" at him in a way that "annoyed" Stephens.

However, Stephens admitted in his deposition that he had no knowledge or facts that would leave him to believe that anyone employed by Western Pulp would have any reason to know or suspect that Green would be likely to commit an assault.   Absent a showing that Green's assault against Stephens was foreseeable, the Court finds that Western Pulp cannot be liable as a matter of law for negligent hiring, supervising, or retaining Green.

IV.   Conclusion

After careful review and consideration, and for the reasons stated above, the Court finds no genuine issue of material fact that precludes summary judgment as to any of Stephens' claims.  It is therefore,

17

ORDERED, ADJUDGED, and DECREED that Defendant's Motion for

Summary Judgment be, and hereby is, GRANTED in all things.

It is SO ORDERED.

**SIGNED this 21st day of July, 2006.**


MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

18